

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE:JPM/GN
F. #2017R00050

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 18, 2020

By ECF

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Stephen Cotogno
                  Criminal Docket No. 19-274 (EK)

Dear Judge Komitee:

       The government respectfully submits this letter in advance of the defendant Stephen Cotogno's sentencing proceeding, which is scheduled to occur on June 1, 2020. The defendant, the former owner of a freight-shipping company and warehouse in Staten Island, New York, lied to federal agents to cover up crimes taking place at his business. The defendant's intentional behavior hindered and delayed a federal investigation into a large-scale scrap metal fraud. However, because the defendant is of advanced age and has significant medical conditions, and this is the defendant's first conviction, the government respectfully submits that a sentence of two years' probation with a modest fine is appropriate under 18 U.S.C. § 3553(a).

I.      Factual Background

       On February 9, 2016, a U.S. Department of Commerce Special Agent and an Agent from Homeland Security Investigations met with the defendant at his warehouse in Staten Island. The warehouse was the principal place of business for Coty Enterprises Ltd., the defendant and his family's freight, storage, and shipping company for almost 50 years. The agents informed the defendant that the interview concerned a company called Omni Metal Corporation, which listed the warehouse's address as its own. During the interview, the defendant told the agents that he knew of Omni, and that the business had leased space in his warehouse. Specifically, he told the agents that "John Heck of Omni Metal Corporation leased a loading bay dock at Coty Enterprises in November 2015." The defendant further stated that Heck and his employees "used the bay doors to load containers of metal scrap,"

but that the defendant "did not witness the loading or unloading at any time." The defendant described Heck as a middle-age male with blond hair and a crossed eye, and provided an email sent by Heck to the defendant as well as Heck's contact information. The defendant showed agents the warehouse and the scrap metal, and said Heck/Omni owned him more than $16,000.

Those were all lies. The defendant had parroted a cover story created by a group of fraudsters and con artists who had used the defendant's warehouse to steal approximately $484,000. As the defendant has now acknowledged with his plea of guilty, when he met with federal agents, he knew about the fraud scheme, he personally knew its perpetrators, he knew there was no "John Heck," and he acted with a clear purpose to throw agents off the trail and obstruct an ongoing investigation.

The fraud scheme the agents had come to inquire about was, in fact, orchestrated principally by three men—Staten-Island-based attorney Richard Luthmann, a client of Luthmann's described in court filings as "Co-Conspirator 1", and another Staten Island resident named George Padula, III. In mid-2015, the three conspirators formed a company called Omni Metal Corporation ("Omni")—the name was chosen because it closely resembled a legitimate scrap and recycling business, and they thought their business' name would deceive customers who researched Omni on the internet.

The conspiracy was a bait-and-switch. Omni offered for sale various types of high-quality metal scrap, such as stripped copper wiring and electric motors. The product, which consisted of piles of tens of thousands of pounds of metal, was stored at the defendant's warehouse, and customers were brought in to the warehouse to view the metal. After being shown the metal and told it could ship immediately, contracts for sale were drawn up. After the customers left, the Omni employees began loading the customer's shipping containers with fillers (e.g., cement road barriers, concrete bags, and garbage from around the warehouse and its parking lot), instead of any of the metal the customer had just ordered. The conspirators would then drape a small amount of metal scrap over the filler material to veil their crime—often photographing what appeared to be a full container of valuable material create fraudulent records. The containers would then be sealed and loaded on to ships bound principally for China.

Omni used the defendant's warehouse as its principal place of business. The defendant knew Co-Conspirator 1 as they were both members of the same country club. He knew that Co-Conspirator 1 was using a fake name—"John Heck"—and he knew the identities of many of the Omni employees. The defendant learned of the bait-and-switch being pulled by Omni during the time Omni operated in his warehouse. Among other things, the defendant's own employees observed Omni's employees loading shipping containers with cement and reported that conduct to the defendant. The defendant could also see the remnants of Omni's work, as concrete road dividers from his parking lot went missing.

Because Omni's fraudulent scheme would be discovered once the shipping containers reached China, the conspirators had only a short window to make as many "sales"

as possible before the first shipments arrived in China. Most of the shipments were made between October 2015 and February 2016. When agents visited the defendant in February 2016, mere weeks had passed since the last container had been loaded, and the defendant's truthful answers could have made a difference to the investigation.

Instead, the defendant lied and then let two months pass before, on April 18, 2016, he called one of special agents to ask if there were any updates on the investigation. After being informed the investigation was ongoing, the defendant then stated, in sum and substance, that he had had enough of the situation and wanted to "give up" the individuals involved because they owed his warehouse a substantial sum of money. The agents then again met with the defendant at his warehouse. There, the defendant described the actual identity of "John Heck" as Co-Conspirator 1, and further revealed the actual identities of the other participants in the scheme.

On November 30, 2017, a grand jury indicted Luthmann and Padula for their role in the scrap metal fraud conspiracy and other offenses. See United States v. Luthmann, et al., Docket No. 17-CR-664 (JBW) (RJD) (EK). On December 5, 2017, the Honorable Marilyn D. Go, United States Magistrate Judge, issued an arrest warrant for the defendant based on a criminal complaint. The defendant, Luthmann and Padula were arrested on December 15, 2017. The defendant was released on a $100,000 bond.

On August 1, 2019, the defendant entered a plea of guilty to the sole count of a criminal information charging a violation of 18 U.S.C. § 1001(a)(2). The plea was taken by the Honorable Vera M. Scanlon, U.S. Magistrate Judge, on a referral from the Honorable Jack B. Weinstein, United States District Judge. See ECF Dkt. Nos. 28, 29.

On December 20, 2019, the U.S. Probation Department ("Probation") issued the Presentence Investigation Report ("PSR"). The government has no objections to the PSR. On February 12, 2020, Judge Weinstein recused himself from this case and it was reassigned to this Court. On February 29, 2020, the Court issued an order setting the sentencing for June 1, 2020.[1]

---

[1] The defendant has consented to proceeding with his sentencing by video and the government does not oppose proceeding under the procedures provided for by the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The CARES Act provides that felony pleas and sentencings may occur by video teleconferencing during the coronavirus national emergency if three requirements are satisfied. CARES Act, § 15002. First, the Judicial Conference of the United States must find that the coronavirus emergency will materially affect the functioning of the federal courts generally or a particular court. CARES Act, § 15002(b)(2)(A). Second, the chief district judge of the district must find that appearances "cannot be conducted in person without seriously jeopardizing public health and safety." Id. Third, the district judge in each particular case must find "for specific reasons that the [plea or sentencing] . . . in that case cannot be further delayed without serious harm to the interests of justice." Id. The first two requirements have already been satisfied. See "Judiciary Authorizes Video/Audio Access During COVID-19 Pandemic," Administrative

II.      The Guidelines Calculation

   A.      Applicable Law

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still required to consider Guidelines ranges in determining sentences, but also may tailor the sentence in light of other statutory concerns. See 543 U.S. 220 (2005); see also 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

   B.      Guidelines Calculation

The government respectfully submits that Court adopt the Guidelines calculation set forth in paragraphs 15 to 23 of the PSR. The base offense level under U.S.S.G. § 2B1.1 is 6, and there are no applicable enhancements. With a two-level decrease

---

Office of the United States Courts (published March 31, 2020) (available at https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-videoaudio-access-during-covid-19-pandemic); Chief Judge Mauskopf's Administrative Order 2020-13, dated March 30, 2020, ¶ 2 ("[F]elony sentencings under Rule 32 of the Federal Rules of Criminal Procedure cannot be conducted in person without seriously jeopardizing public health and safety"). With respect to the third requirement, the government would request that the Court make appropriate findings prior to or at the sentencing proceeding if it should proceed on June 1, 2020. Among other facts that support such findings are that the defendant is of advanced age and has significant medical conditions, both of which counsel against any delay of his sentencing and also make his appearance in-person impossible during the COVID-19 pandemic.

for acceptance of responsibility, the total offense level should be 4. The defendant is in criminal history category I, and the advisory Guidelines range is 0 to 6 months' incarceration, a range that falls within Zone A of the Guidelines. See PSR ¶ 56.

III.     The Appropriate Sentence

The defendant committed a serious offense after a life that included admirable military service in Vietnam and 70 years without a run-in with the criminal justice system. Although the defendant lied to federal agents, he subsequently reinitiated contacted with them and admitted he had lied. The defendant is now retired, has significant medical conditions, and poses no risk of recidivism. Thus, the government respectfully submits a period of probation is most appropriate and because the defendant has means, a modest fine is also warranted.

   A.    The Nature and Circumstances of the Offense

The government respectfully submits that the nature and circumstances of the defendant's offense weigh in favor of a Guidelines sentence. See 18 U.S.C. § 3553(a)(1). The defendant knowingly misled federal agents who had just commenced an investigation seeking to find who had been shipping thousands of pounds of garbage abroad, instead of valuable scrap metal that had been ordered and paid for. By covering up for the Omni conspirators, the defendant chose to align himself with an unscrupulous group of fraudsters. The defendant participated in an interview with federal agents and then lied, for the clear purpose of throwing the investigators off. His lie was not momentary; he doubled down by giving false physical descriptions, a bogus email address, and parroting a cover story that evidence his full knowledge of what he allowed to take place at his warehouse. His principal motivation for engaging with the conspirators appears to have been easy money from the conspirators' use of his warehouse, and even when he "came clean" by calling agents in April 2016 to admit he had lied, he indicated that he did so primarily because he wanted to collect unpaid rent from the conspirators. Overall, these factors support a sentence within the Guidelines range.

   B.    The History and Characteristics of this Defendant

The government respectfully submits that the defendant's personal history and characteristics favor leniency at sentencing. See 18 U.S.C. § 3553(a)(1). The defendant has no known prior arrests or convictions. See PSR ¶¶ 24-25, 27. He served in the military in Vietnam and was honorably discharged. PSR ¶ 34. The defendant, now age 74, suffers from significant medical conditions that mitigate against a term of incarceration. See PSR ¶ 41.

   C.    The Need for Deterrence

The need to afford adequate general deterrence to criminal conduct favors a Guidelines sentence, although there is no apparent need for specific deterrence here. See 18 U.S.C. §§ 3553(a)(2)(B), 3553(a)(2)(C). With respect to general deterrence, the enforcement of our laws depends on the integrity of a system in which everyone agrees to respond

truthfully if summoned or questioned. The defendant's conduct served to erode that system. His conduct delayed uncovering wrongdoing and the justice due to victims of the scrap metal fraud. Nonetheless, in light of his particular circumstances, the defendant himself is unlikely to be a recidivist.

>    D.    The Need to Promote Respect for the Law

The need for the sentence imposed to promote respect for the law weighs in favor of a Guidelines sentence. See 18 U.S.C. § 3553(a)(2)(A). As detailed above, the defendant's conduct was a clear and knowing violation of law. His "coming clean" was motivated as much by personal financial gain as any remorse for his lies. These factors suggest that the defendant's overall respect for law and law enforcement is poor.

>    E.    The Need to Provide Just Punishment

The government respectfully submits that the need for just punishment in this case weighs in favor of leniency. See 18 U.S.C. § 3553(a)(2)(A). A sentence of probation for a defendant would curtail the defendant's freedom to a reasonable degree and require his strict compliance with Court supervision. A felony conviction also carries substantial ramifications. Having flouted the law's requirements with his conduct here, limiting the defendant's travel, use of alcohol, and instituting other standard conditions of probation are fair limitations that will reinforce his obligation to be truthful if the defendant is ever again called upon as a potential witness to wrongdoing.

>    F.    A Sentence of Probation Would Not Result in an Unwarranted Sentencing Disparity

There is little risk of a sentencing disparity with a probationary sentence. Judge Weinstein sentenced Luthmann to four years' imprisonment following his guilty plea to wire fraud conspiracy and extortionate collection of credit conspiracy. The other conspirators are awaiting trial or sentencing. Luthmann played a much more significant role at the center of the fraudulent scheme, along with Padula, Co-Conspirator 1 and the other Omni employees. The defendant helped cover their tracks, but he did not profit to the tune of almost $500,000, as the Omni conspirators did. There were also egregious factors present in Luthmann's case that are not present with the defendant. Among them, Luthmann, Padula and Co-Conspirator "recruited a blind person under the care of a guardian ad litem to be the nominal president of the company, and laundered the proceeds of the transactions through various banks." United States v. Luthmann, No. 17-CR-664, 2019 WL 5423570, at *2 (E.D.N.Y. Oct. 23, 2019). Luthmann laundered some of the funds through his law firm's IOLA account, abused his position of trust as an attorney, and also facilitated an extortion in his law office. Id. Moreover, during pre-trial proceedings, Luthmann leaked the government's evidence in violation of a court order. Id.

In the present case, the defendant's criminal conduct was far less extensive, and thus forms a basis for leniency when compared with the Omni conspirators.

6

IV.  Conclusion

For the foregoing reasons, the government respectfully submits that the Court impose a sentence of two years' probation and a modest fine.

                                              Respectfully submitted,

                                              RICHARD P. DONOGHUE
                                              United States Attorney

By:      /s/
        James P. McDonald
        Genny Ngai
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of Court (EK) (by ECF)
       Robert LaRusso, Esq. (by ECF)