1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,       : 19-CR-0074(ERK)
                                :
                                :
                                :
       -against-                : United States Courthouse
                                : Brooklyn, New York
                                :
                                :
                                : Monday, June 1, 2020
STEPHEN COTOGNO,                : 10:00 a.m.
                                :
          Defendant.            :
                                :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:   RICHARD P. DONOGHUE, ESQ.
                      United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                   BY:  JAMES P. McDONALD, ESQ.
                      GENNY NGAI, ESQ.
                      Assistant United States Attorneys


 For the Defendant:   LaRUSSO CONWAY & BARTLING, LLP
                      300 Old Country Road
                      Suite 341
                      Mineola, New York 11501
                   BY: ROBERT P. LaRUSSO, ESQ.


Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

SAM     OCR     RMR     CRR     RPR

Proceedings - Via Videoconference                    2

1                          (In open court.)

2            (All participants via video and teleconference.)

3                (Judge ERIC R. KOMITEE presiding.)

4            THE COURTROOM DEPUTY:  Criminal cause for

5    sentencing, Docket Number 19-CR-274, United States of America

6    versus Stephen Cotogno.

7            Would you all please state your appearances for the

8    record, starting with the Government?

9            MR. McDONALD:  Good morning, Your Honor.

10           Good morning, everyone.  It's James McDonald on

11   behalf of the United States.

12           THE COURT:  Good morning.

13           MS. NGAI:  Good morning, Your Honor.  I'm also

14   joining for the Government, and this is Genny Ngai.

15           THE COURT:  Good morning.

16           MR. LaRUSSO:  And Robert La Russo representing

17   Mr. Cotogno.

18           Good morning, Your Honor.  Good morning, everybody.

19           THE COURT:  Good morning, Mr. LaRusso.

20           USPO DENIZ:  And good morning, Your Honor, Angelica

21   Deniz with United States Probation.

22           THE COURT:  Good morning.  Good to have you on.

23           THE COURTROOM DEPUTY:  That's it, Judge.

24           THE COURT:  All right, thank you.

25           So, we're here today for a sentencing as everyone

1    knows.

2          First off, can I just make sure I understand how to

3    pronounce the defendant's name?  And it sounds like people are

4    mostly saying Mr. *KUH-TOG-NOE*.

5          THE DEFENDANT:  That's correct, Judge.

6          THE COURT:  Okay.

7          I am very sympathetic, as somebody whose last name

8    is mispronounced much more frequently than it's pronounced

9    correctly.

10         THE DEFENDANT:  Actually, you did it perfect.

11         THE COURT:  Okay, good.

12         So, these are, obviously, not ideal circumstances in

13   which to be going forward for sentencing, but we are living in

14   less than perfect times right now and this may be the best

15   option that we have under the circumstances.

16         I want to start out by saying, so I have a series of

17   screens in front of me and I also have a printed out outline

18   for sentencing, just to make sure I cover every matter that we

19   need to cover on the record.

20         For everybody on the call, but, Mr. Cotogno, for you

21   in particular, if you see me looking off what seems to my

22   left, I am not checking on news or the Internet or anything,

23   I'm looking at various records --

24         THE DEFENDANT:  Okay.

25         THE COURT:  -- that I have in front of me.

1          The first thing we need to do is just acknowledge

2    that we are moving forward by videoconference at Mr. Cotogno's

3    request and with his consent.  That is not something that has

4    always been allowed under the Rules of Criminal Procedure,

5    namely to have sentencing proceedings by video, and there are

6    certain findings that I need to make before we go forward this

7    way.

8          In plain English, Mr. Cotogno, I just want to start

9    out by saying that if you wanted to delay this sentencing

10   proceeding until it was deemed safe for you to travel and for

11   us to gather in court, we would accommodate that request, but

12   I understand that you wish to go forward today by video

13   instead of waiting to move forward in person.

14         Is that correct?

15         THE DEFENDANT:  Yes, that's correct, Your Honor.

16         THE COURT:  Okay.  So as I mentioned, I need to make

17   certain findings on the record to move forward that way.

18         First, do you understand you have the right to be

19   physically present in open court for sentencing?

20         THE DEFENDANT:  Yes, I understand.

21         THE COURT:  And you understand that you have the

22   right to consult with your lawyer during the sentencing, so if

23   we were in court together we would go off the record for a

24   period, you and your attorney would find a place in the

25   hallway or in a conference room where you could confer with

Proceedings - Via Videoconference                          5

1   each other, but out of earshot of the Court or the Government

2   or the Probation Department or anybody else.  We can make that

3   happen in this virtual environment as well.  If there is any

4   point at which you need to confer with your lawyer because you

5   don't understand what's going on or because you have questions

6   or anything you want to consult with your lawyer about, we can

7   arrange that by what I guess people are calling a virtual

8   breakout room, where you and Mr. LaRusso could speak to one

9   another, but nobody else would be party to that, that

10  particular conversation.

11              Do you understand that?

12              THE DEFENDANT:  Yes, I understand.

13              THE COURT:  Okay.

14              Have you consulted with your attorney regarding the

15  waiver of your right to appear here in person?

16              THE DEFENDANT:  Yes, I have.

17              THE COURT:  Okay.  And you understand that your

18  family members and other supporters also have the right to

19  attend this proceeding?

20              THE DEFENDANT:  Yes.

21              THE COURT:  Okay.

22              Do you agree to waive your right to appear in person

23  for sentencing and instead appear by video?

24              THE DEFENDANT:  Yes, I do.

25              THE COURT:  Okay.

Proceedings - Via Videoconference                6

1           Your lawyer and also the lawyer for the Government

2    have indicated that the reason, or at least part of the

3    reason, you want to proceed expeditiously here by video is

4    because of your age and certain medical conditions.  And

5    specifically, your lawyer has indicated that you would have

6    extreme difficulty in traveling to the Eastern District of

7    New York for in-person sentencing, both because of your

8    medical conditions and because of the COVID-19 pandemic.

9           Is that a fair statement of why you want to move

10   forward by video here today?

11          THE DEFENDANT:  It's actual statement, yes, it's --

12   it's true.

13          THE COURT:  Okay, thank you.

14          All right.  So, based on that conversation I now

15   make the following findings:

16          I find that the Judicial Conference has determined

17   that the COVID-19 emergency is materially affecting the

18   functioning of the federal courts.  These are findings that

19   are required by the new statute that allowed us to proceed by

20   video.  I find that Chief Judge Mauskopf, the chief judge of

21   the Eastern District of New York, has issued an order dated

22   March 30th of 2020 finding that felony sentencing under

23   Rule 32 of the Federal Rules of Civil Procedure cannot be

24   conducted in person without seriously jeopardizing public

25   health and safety.

1          Because Mr. Cotogno is seeking a sentence of

2     probation and because of his advanced age, or at least a

3     non-custodial sentence I should say, and because of his

4     advanced age and ongoing medical conditions, I now find that

5     further delay of this proceeding would create the risk of

6     serious harm to the interests of justice, and I cite

7     Administrative Order Number 2021-13 at paragraph 2.  That is

8     the order from the Chief Judge that I mentioned a few moments

9     ago.

10          I further find that Mr. Cotogno has knowingly and

11     voluntarily waived his right to appear physically in court and

12     has agreed knowingly and voluntarily to proceed by

13     videoconference.

14          I find that the measures taken to provide public

15     access to this proceeding are reasonable under the

16     circumstances, and that to the extent the defendant's right to

17     public access is in any way impaired, Mr. Cotogno has

18     knowingly and voluntarily waived that right.

19          Let me start off by describing for the record the

20     arrangements that we have set up for this proceeding.

21          On your screen you should be able to see me, my

22     courtroom deputy, Ms. Guy, the lawyers, both your lawyer and

23     the lawyers for the Government.  You will not see the

24     probation officer, but you should be able to hear her.

25          Is it accurate to say that you can see and hear, as

Proceedings - Via Videoconference                    8

1   relevant, those people?

2           THE DEFENDANT:  I cannot.

3           THE COURT:  Cannot?

4           THE DEFENDANT:  I cannot.

5           THE COURT:  You can't see anybody?

6           THE DEFENDANT:  I see four -- six people.

7           THE COURT:  Okay, so you see your lawyer?

8           THE DEFENDANT:  I see my lawyer.

9           THE COURT:  Do you see me?

10          THE DEFENDANT:  If I knew what you looked like.  I

11  see --

12          THE COURT:  I am wearing a blue blazer and a white

13  V-shirt with no tie.

14          Do you see me or no?

15          THE DEFENDANT:  No, I don't.  I see a white

16  shirt and a medical blazer, and then I see, I think it's James

17  McDonald, I'm not sure.

18          THE COURT:  Mr. McDonald is wearing a blue suit and

19  a white shirt with a blue tie.

20          THE DEFENDANT:  I see him.

21          THE COURT:  I am now waving my hands.

22          THE DEFENDANT:  I don't see you.

23          THE COURT:  Okay.  All right, so we are, obviously,

24  proceeding under less than perfect circumstances here, and I

25  think the question for both Mr. LaRusso and for Mr. Cotogno is

Proceedings - Via Videoconference                    9

1  given the technical difficulties that we have had so far,

2  given the defendants, obviously, have a right to see the judge

3  at sentencing.  I can see Mr. Cotogno, which is important to

4  me, but I understand the situation is not working in reverse.

5           The question, Mr. LaRusso, to you and your client

6  is, do you want to proceed under these circumstances and do

7  you believe that for all the reasons I said before that it is

8  important to do so, even given some of the technical issues we

9  are having, rather than wait to proceed in person?

10          MR. LaRUSSO:  Your Honor, my opinion right now and

11 my advice to my client would be that under the circumstances I

12 think we should go forward.  I think the Court has all the

13 information necessary and as the Court indicated, you are able

14 to see my client.  I don't know how important it is to my

15 client to see you.  I can say that you have a nice beard, Your

16 Honor.

17          THE COURT:  Thank you.

18          MR. LaRUSSO:  I've wanted to grow one, so I'm

19 jealous, I'll be honest with you.

20          THE COURT:  I have been working on it during

21 quarantine, so...

22          MR. LaRUSSO:  But I'll leave it up to him, Judge, if

23 there is a personal opinion that he feels it's necessary to be

24 able to see you, I would advise that we go forward.

25          THE DEFENDANT:  I have no problem with that, Bob.

Proceedings - Via Videoconference                  10

1   For me to make that trip, I don't even know if I could do it,

2   I'll be honest with you.

3          MR. LaRUSSO:  Your Honor, just to bring you up to

4   date:  I spoke with Mr. Cotogno last night, and though his

5   face doesn't really reflect it, he has been in constant pain

6   primarily because of his back, and he indicated to me he

7   really would like to move forward to be able to take care of

8   his ailments and his age and to be able to spend time with his

9   family.

10         So I think his decision to go forward is based upon

11  solid -- a solid foundation, Your Honor.

12         THE COURT:  Okay.

13         Do you agree with that, Mr. Cotogno?

14         THE DEFENDANT:  Yes.  Yes, I do.

15         THE COURT:  Okay.

16         All right, then under the circumstances and for the

17  reasons I have already said on the record, I am in agreement

18  that the interest of justice would be served, best served by

19  proceeding by video at this point rather than waiting, but I

20  will just reiterate, Mr. LaRusso and Mr. Cotogno, if at any

21  point you feel like your ability to participate fully and

22  effectively here is suffering because of the technical issues,

23  just flag the moment for us and we will seek to address that

24  in whatever the best way we can is under the circumstances.

25         THE DEFENDANT:  Thank you.

Proceedings - Via Videoconference                    11

1       THE COURT:  Does that make sense?

2       THE DEFENDANT:  Yes, that works for me.

3       THE COURT:  Okay.

4       So before we begin, Mr. Cotogno, I want to start by

5   explaining to you the overall process for this morning,

6   essentially just giving an outline of what the various topic

7   areas that we are going to cover is.

8       So, first what I'll do is I am going to list on the

9   record every submission that I have received and considered

10  for sentencing.  And the purpose for that is simply to make

11  sure that we are all looking at the same documents, that the

12  parties can be assured that I have received everything the

13  parties think I should have received, and that you all have

14  received everything, so that we are all working off the same

15  information.

16      Second, we will discuss the Probation Department's

17  pre-sentence report.  I understand there are some, I don't

18  know if formal objections is the right word, but that your

19  sentencing submission, Mr. LaRusso, takes issue with some of

20  the factual recitations in the PSR, and we will resolve those

21  today.

22      Next, under federal sentencing law I have to

23  determine what the guidelines range is, the range of

24  incarceration and other factors under the Advisory Sentencing

25  Guidelines system.

1          The Guidelines, as I mentioned, are advisory.  They

2     are not binding on this court, but nevertheless, the Court

3     must still determine what the guidelines range is.  And I must

4     consider the Advisory Guidelines, as well as any departures

5     that might apply in a given case, even though I don't believe

6     there are any pending motions for upward or downward

7     departures before the Court today.

8          I also have to consider what we call the Section

9     3553(a) factors.  Those are the factors set out in the statute

10    in Title 18 of the U.S. Code.  Congress has required that we

11    consider certain factors outside of the Advisory Guidelines

12    system that relate to the nature of the offense and your

13    history and other factors.

14         After I consider all of this, I will give the

15    attorneys an opportunity to address the Court and to make any

16    arguments that they wish to make, understanding that I have

17    already carefully reviewed their written submissions with

18    respect to sentencing.

19         Final, Mr. Cotogno, you also have the right

20    yourself, but not the obligation, to make a statement to the

21    Court if you choose before I impose sentence.  I know that you

22    submitted a letter to the Court, which I have read carefully,

23    I have read all of the letters that have been submitted, but,

24    nevertheless, if you wish to make an additional statement

25    today, I will be happy to give you that opportunity.

Proceedings - Via Videoconference                13

1          THE DEFENDANT:  Thank you, Your Honor.

2          THE COURT:  Once all of this has happened, I will

3    impose sentence.

4          Do you understand the process?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you have any questions at this stage?

7          THE DEFENDANT:  No.

8          THE COURT:  Okay.

9          So, I will note that Mr. Cotogno's guilty plea was

10   before Magistrate Judge Scanlon, that he pleaded to the sole

11   count of the Information, and that that Information charged

12   him with knowingly and willfully making one or more materially

13   false, fictitious and fraudulent statements and

14   representations, and that this was charged as a violation of

15   Title 18 U.S. Code Section 1001(a)(2).

16         I have received the following documents in

17   preparation for this sentencing hearing:

18         The pre-sentence report dated December 20th of 2019.

19   I have a confidential recommendation from the Probation

20   Department regarding the sentence that the Probation

21   Department recommends be imposed, restitution, fine, other

22   factors.

23         I have the Government's sentencing memorandum dated

24   May 18th, 2020.

25         I have the defendant's sentencing memorandum dated

1  May 18th, 2020.

2           I have a series of letters in support of the

3  defendant.  Letters from a number of family members, including

4  the defendant's daughter, Jillian DeFazio, dated May 4th,

5  2020; a letter from his son, Stephen Cotogno, dated May 5th,

6  2020; a letter from his brother Joseph, also dated May 5th,

7  2020; and several letters from friends, including Patrick

8  DeRespinis, dated October 9th; Kenneth Lee, dated October 8th,

9  2019; Felix Schirripa, dated October 8th, 2019; Marcos Chang,

10  dated October 14th, 2019; a letter from the defendant's

11  physician confirming his physical condition, and a letter from

12  Dr. Kristopher Tardio, dated July -- that is the letter from

13  the physician, dated July 9th 2018.  And I don't know if

14  "physician" is the right word there, that may be a different

15  type of practitioner, but I have read that letter carefully.

16           I also have the Government's letter regarding

17  restitution and victim identities in this case that was just

18  submitted on Friday of this past week in response to the order

19  that I put on the docket on Friday.

20           Mr. LaRusso, I just want to make sure that you saw

21  the Government's most recent submission, given how recently it

22  was submitted.

23           MR. LaRUSSO:  Your Honor, I saw it before it was

24  filed and I read it after it was filed, and I provided a copy

25  to my client.  I'm not sure what day I provided it, but it was

Proceedings - Via Videoconference                    15

1  shortly after it was filed.

2           THE COURT:  Okay.

3           Mr. Cotogno, that was because I had some questions

4  about -- I understood you have an agreement on restitution

5  with the Government as far as the amount of restitution that

6  will be paid, but I didn't understand, getting ready for

7  today's proceedings, who that restitution was going to be paid

8  to and how it would be paid to them.  And so I asked for a

9  further follow-up from the Government, which they provided

10  expeditiously, and I understand that your lawyer was in that

11  loop as well.

12           THE DEFENDANT:  He provided it to me.

13           THE COURT:  Thank you.

14           Is there anything else that I should have,

15  Mr. McDonald?

16           MR. McDONALD:  No, nothing comes to mind, Your

17  Honor.

18           THE COURT:  Okay.

19           Anything else, Mr. LaRusso, that I should have?

20           MR. LaRUSSO:  No, Your Honor, not that I can think

21  of.

22           THE COURT:  Okay.  And, Mr. LaRusso, have you and

23  your client read and discussed the pre-sentence report?

24           MR. LaRUSSO:  We have thoroughly, Your Honor.

25           THE COURT:  Okay.

1          Before proceeding further, I just want to briefly

2     come back to this question of what we are sealing on the

3     record here.  We had some back-and-forth about what would be

4     sealed.  Mr. Cotogno, you have now asked to seal your medical

5     records in their entirety, which I understand.  There was also

6     some back-and-forth about the question of whether we would

7     redact on the record the name of an alleged co-conspirator who

8     has not yet been indicted.

9          As to the proposed redactions that the defense has

10    made to date, I find that all of those proposed redactions of

11    the exhibits are narrowly tailored to legitimate privacy

12    interests, both the defendant's medical conditions and also

13    the interest of the alleged unindicted co-conspirator.

14         But there are, I think, some additional references

15    to that alleged unindicted co-conspirator's name, and I just

16    want to ask both parties whether they have a position on

17    whether we should be making further redactions to make sure

18    that that person's name is redacted everywhere it appears?

19         Mr. McDonald, does the Government have a view on

20    that?

21         MR. McDONALD:  I don't have.  I don't have a view on

22    that.  It's Mr. LaRusso's application.  I don't have any

23    objection to it, but I am not able to make my own application

24    for it.

25         THE COURT:  Okay.

1          MR. LaRUSSO:  Your Honor, if I could.

2          I'm very sensitive, having been an assistant, to

3     disclosing in public records the name of confidential

4     informants.  What I did in the redaction was leave Mr. -- the

5     cooperator's name in the file document, but in no way

6     discloses him to be an informant.  I took out the footnote,

7     which would have probably identified him as such.  So upon

8     reading the redacted indictment, you wouldn't in any way draw

9     the inference that he was a cooperator.  That's why I just

10    removed the footnote, to prevent that inference from being

11    drawn.

12          THE COURT:  Okay.

13          All right, so based on that colloquy, I now find

14    that the proposed redactions are narrowly tailored to

15    legitimate privacy interests and I order those redactions

16    made.

17          Is either party seeking an evidentiary hearing today

18    on any issue?  I take it the answer is no.

19          MR. McDONALD:  The Government is not seeking a

20    hearing, Your Honor.

21          MR. LaRUSSO:  No, Your Honor.  We neither are

22    seeking it at all.

23          I know you referenced earlier in our sentencing

24    submission we had commented upon some of the factual aspects

25    of the pre-sentence report.  We are not taking exception to

Proceedings - Via Videoconference                    18

1   those facts, we just are seeking clarification for the Court's

2   understanding of my client's role in the underlying offense.

3           It was just by way of clarification, expansion of

4   the facts, explanation, it was no exception taken to the

5   presentation warranting a hearing.

6           THE COURT:  Okay, and we will get into the specific

7   facts alleged in the PSR that the defendants may have a

8   different view about, but let me now turn to the calculation

9   of the advisory guidelines range.

10          So, according to the pre-sentence report, the

11  Probation Department calculates the total offense level as 4,

12  which is based on the calculation that is reflected in

13  paragraphs 14 through 23 of the PSR.  And the way they get

14  there is that the guideline for Section 1001 offenses, the

15  applicable guideline is U.S. Sentencing Guidelines Section

16  2B1.1, which provides for a base offense level of 6, and then

17  that base offense level is reduced by two points because the

18  defendant has clearly demonstrated acceptance of

19  responsibility under U.S. Sentencing Guideline 3E1.1(a).  So,

20  that is a net offense level of 4.

21          Probation calculates a criminal history score of

22  zero based on the lack of past or pending convictions or

23  sentences, and that puts the defendant in Criminal History

24  Category I.

25          So putting that all together, a total offense level

1  of 4, and Criminal History Category of I, resulted in advisory

2  guidelines imprisonment range of zero to six months, and that

3  is in Zone A of the Sentencing Table.

4          Mr. McDonald, does the Government agree with that

5  calculation?

6          MR. McDONALD:  We do, Your Honor.

7          THE COURT:  Mr. LaRusso, does the defense agree as

8  well?

9          MR. LaRUSSO:  Yes, Your Honor.

10         THE COURT:  Okay.

11         So whereas here, the applicable guideline range is

12  in Zone A of the Sentencing Table, a sentence of imprisonment

13  is not required unless the applicable guideline specifically

14  requires it, which in this case it does not.  A special

15  assessment of a hundred-dollars will be mandatory.  The

16  guidelines fine range for this case is 500 to $9,500 under

17  Sentencing Guidelines 5E1.2(c)(3).  And I notified the parties

18  on Friday afternoon, for reasons that I will talk about a

19  little bit later on in this proceeding, that I was

20  contemplating a fine slightly above that range, namely

21  $10,000.

22         Mr. LaRusso, I am not asking at this point for your

23  official position on that potential fine, but I just want to

24  make sure that you saw that notification on the docket as

25  well.

Proceedings - Via Videoconference                    20

1          MR. LaRUSSO:  I did, Your Honor, and I shared it

2     with my client.

3          THE COURT:  Okay.

4          And I note that the parties have stipulated that

5     restitution should be in the amount of $3,953.76.  Victim

6     information, again, for that restitution is contained in the

7     Government's May 29th letter filing.

8          Any other objections from either the Government or

9     the defense as to any aspect of that guidelines calculation

10    that I have set forth, including the fine range?

11         Mr. McDonald.

12         MR. McDONALD:  No, Your Honor, I have no objection.

13         THE COURT:  Mr. LaRusso --

14         MR. LaRUSSO:  No, Your Honor.

15         THE COURT:  -- any objections?  Okay.

16         All right, so the defendant, as I noted, set out

17    various potential differences with some factual recitations in

18    the pre-sentence report.  And I don't understand, based on our

19    discussion so far, I don't understand these to be formal

20    objections to the PSR, but I just want to list for the record

21    the parts of the PSR to which I understand Mr. LaRusso to have

22    raised issues about.

23         First, with whether Mr. Cotogno expected to be paid

24    over $20,000 for his use of the warehouse, that's PSR

25    paragraph 11; whether Mr. Cotogno expected to share in the

1  unlawful proceeds of the fraud, PSR also paragraph 11; whether

2  Mr. Cotogno actively made suggestions to the co-conspirators

3  about what filler materials to use in the scrap metal fraud,

4  that's PSR paragraph 5; the nature of the relationship between

5  Mr. Cotogno and the conspirators in the fraud case, that's PSR

6  paragraph 5; a number of proposed potential changes regarding

7  the PSR's recitation of Mr. Cotogno's financial, especially

8  ways in which his financial situation has changed since

9  December of 2019; and finally, the PSR says Mr. Cotogno

10  charged his co-conspirators at above-market rate for the use

11  of the warehouse knowing about the scrap metal fraud, that is

12  in PSR paragraph 5 as well.

13        I can say with no hesitation that none of the

14  disputes that I have just listed will affect sentence with,

15  perhaps, the one potential exception that it did seem

16  important to me whether Mr. Cotogno was, in fact, charging an

17  above-market rate for his use of the warehouse knowing about

18  the scrap metal fraud.

19        It was unclear to me, Mr. LaRusso, that that's

20  mentioned in your recitation of the places where there may be

21  difference between yourselves and the Probation Department,

22  but I didn't see facts that would specifically contradict

23  that.

24        So, is it important for you that the PSR be modified

25  to strike the reference to the market rate for the use of the

1  warehouse?

2        MR. LaRUSSO:  Your Honor, it is not important that

3  it be modified.  I don't believe that we have to actually take

4  testimony on it, unless the Court feels it's necessary, in

5  terms of the ultimate sentence the Court wants to impose.

6        What I attempted to do in my submission was to

7  explain my client's pricing to the individual who first came

8  to him and negotiated for the rental space.  And what he did

9  is, and I laid it out on page 5, I believe, of my sentencing

10 submissions, a cost for the pallets that were going to be

11 stored in the warehouse and an hourly rate for the use of the

12 forklift in the employee's warehouse.  Mr. Cotogno felt at the

13 time that he negotiated that, that that was a fair market

14 rate, a rate that he had charged other customers.

15       Mr. Cotogno can speak, Your Honor, probably more

16 professionally to this issue, and I have no objection to him

17 addressing the Court if the Court feels it's important enough

18 to hear from him, that in the end his rate that he negotiated

19 with one of the co-conspirators, in particular, did not take

20 into account that the pallets that they were bringing into the

21 warehouse were stackable.  He thought that they were

22 stackable, so he actually gave them a lesser price than what

23 he would have if he had learned that they were not stackable

24 pallets.

25       So, my effort in my sentence submission, Judge, was

1   not to dispute what the Probation Department said.  It might

2   be the Government's position in terms of their review, but in

3   terms of what my client told me and what he knew at the time,

4   the contract was negotiated, those were the terms, and they

5   were not above-market rates taking advantage.  That's the

6   inference, Judge, taking advantage of the fact that he was

7   aware that there was unlawful activity about to take place.

8   That, I -- I believe, the essence of the reasons for this

9   presentation to let the Court know that that's not the

10  inference that you can draw from the facts.

11          Though, my client does later on come to -- become

12  aware of what was going on when filler material was putting

13  into the containers and allowed it to continue.  That -- that,

14  I believe, the Government set out in their sentencing

15  submission, and we have acknowledged that that is true.  But

16  our presentation in regards to the above-market price was to

17  indicate to the Court that my client was not aware from the

18  inception that this was a fraud going on at the time he

19  negotiated the contract.

20          Mr. Cotogno, is there anything --

21          THE COURT:  Yes, I think even before we get to

22  Mr. Cotogno, I think we do have agreement between the parties

23  that by the time he is approached by the Commerce Department

24  agents, Mr. Cotogno is aware of the scrap metal filler fraud

25  that is being conducted by the people who are renting space in

1   his warehouse, but I do want to ask from the Government what

2   the basis is to conclude that he was charging an above-market

3   rent and that he was doing so specifically based on the

4   knowledge at the time that the rent was negotiated that the

5   fraud was contemplated?

6           MR. McDONALD:  Your Honor, the basis, if we had a

7   hearing, would be the expected testimony of one of the

8   participants in the fraud who -- and I don't necessarily think

9   it's totally inconsistent with what Mr. LaRusso is saying, but

10  based on that participant's understanding, they were being

11  charged an above-market rate for the pallets that were being

12  stored there.

13          Mr. LaRusso here has, obviously, gone into a number

14  of details about warehousing and pallets -- palleting that,

15  perhaps, that co-conspirator would have been unaware of in

16  terms of what rates would apply, but as that co-conspirator,

17  who we would expect to testify, would testify, and this is a

18  co-conspirator to the scrap metal fraud I should say, that

19  that co-conspirator's understanding was that it was an

20  above-market rate.

21          It's not something where we have invoices from

22  Mr. Cotogno's warehouse that clearly show a rate for scrap

23  metal in X circumstances and a higher rate here in Y

24  circumstances.  It's entirely a testimonial issue, and for a

25  number of reasons we -- to the extent that it is of

Proceedings - Via Videoconference                    25

1   significant importance to the Court, we don't seek any

2   evidentiary hearing to establish that.

3           I think Mr. LaRusso's explanation though, as I said,

4   puts out a fair inference that someone who is not in the

5   warehousing industry may not have understood, as Mr. Cotogno

6   understood, the different rates for different pallets.

7           What is clear, though, is that during the course of

8   the conspiracy, whether it's at the time of the pricing or as

9   Mr. LaRusso just indicated, when Mr. Cotogno sees the activity

10  within the warehouse, during the time that the fraud is

11  ongoing, Mr. Cotogno undoubtedly becomes aware of what's going

12  on in his warehouse.  I think under any circumstance, any

13  normal circumstance, his obligation at that point, again,

14  regardless of pricing, probably should have been to terminate

15  the contract and shut them down.

16          I know we can address that, but I think that fact,

17  in and of itself, substitutes any probative -- substitutes the

18  probative value for the pricing issue.

19          So, again, I am not seeking an evidentiary hearing

20  to establish the pricing issue separately.

21          MR. LaRUSSO:  Your Honor, if I could just reply

22  briefly.

23          I don't know if the Court had a chance to see my

24  client when he was shaking his head yes to the comments --

25          THE COURT:  I did see that.

1      MR. LaRUSSO:  -- made by Mr. McDonald.  And I think

2  that's the telling point here, I hope, is that my client

3  acknowledges that during the course of the conspiracy he

4  became aware, as we say, through his employees that there was

5  a fraud going on, that filler material was being placed in the

6  containers and that he, after learning that, did not do

7  anything to stop it.

8          As a matter of fact, there were three occasions when

9  filler material was actually being used and my client became

10  aware of all three.  The first one was cement blocks, the

11  parking lot cement blocks.  After he was made aware of it, he

12  actually negotiates a price with one of the co-conspirators to

13  pay for the use of the blocks.  And later there was some

14  paving stones belonging to another customer that was used.  He

15  gets -- becomes aware of that and he advises the

16  co-conspirators to pay the customer for it, but with knowledge

17  that what they were doing continued.  And the third one was a

18  cement truck actually pulled in without his knowledge, cement

19  bags were being filled and put into the containers.  And that

20  third one, Your Honor, I think occurred sometime in late

21  November and December.

22          So, the Government's position, and our position, is

23  factually my client did become aware of it as the conspiracy

24  was ongoing at the warehouse and did nothing to stop it.

25          That's the backdrop, Judge, to the false statement

1   that he makes to the agents sometime in early February of the

2   following year.

3          I hope that clarifies for the Court.  It's not the

4   dispute as much as a clarification of what actually happened.

5          THE COURT:  Okay.  That has all been very helpful to

6   me.  I did see Mr. Cotogno nodding along as the Government,

7   when Mr. McDonald was talking about the fact that he does come

8   into knowledge later about the fraud that's transpiring in his

9   warehouse, and I do conclude that we have agreement between

10  the parties that Mr. Cotogno is on notice of the fraud at some

11  point in advance of the occurrence of the 1001 violation.

12         As to, therefore, all of the issues that I listed

13  that Mr. LaRusso raised in his letter, I find that a ruling on

14  those disputed facts is unnecessary because the matters will

15  not affect sentencing and the Court will not consider those

16  disputed facts in sentencing.

17         All right, so as I mentioned earlier I reviewed

18  these written sentencing submissions in detail.  I will turn

19  now to Mr. LaRusso to ask if you want to be heard on

20  Mr. Cotogno's behalf.

21         MR. LaRUSSO:  If I could , Your Honor.  And I am

22  going to use the word briefly, and I hope I am accurately

23  describing my upcoming remarks.  Some years ago I was told

24  sometimes if you say too much you could hurt your client, and

25  I hope that I don't do that at this point in time.

1    Your Honor, as you indicated, you carefully reviewed

2    all of the submissions and, therefore, I will not repeat them,

3    but I would just like to highlight my client's remorse.  He's

4    lived, up until this episode, an exemplary life.  He served in

5    the military and his record actually speaks for itself.  I, at

6    first, when he described his military service, he understated

7    it.  And it only came about actually recently that I learned

8    that his lacerated finger was actually a severed finger and

9    that it had to be reattached.  Gangrene developed, and for the

10   next many months, probably over a year, had rehabilitation,

11   both I believe in Vietnam and Japan, and then ultimately in

12   St. Albans.

13   I took the opportunity in my submission to let the

14   Court know that his service was not just, you know, the

15   two-year normal service.  He did serve this country, I

16   believe, with distinction and it is an important

17   consideration.  So, I took a little bit more effort to

18   describe it to the Court than I would normally in most cases.

19   Your Honor, the other aspect of this is that, you

20   know, since his service in the military, Mr. Cotogno has

21   suffered a number of illnesses, probably more than one man

22   should have to actually endure.  And part of the -- part of

23   the problem for me initially was getting him to describe it

24   thoroughly enough for me to understand what he has had to go

25   through over the many years, and they're outlined in the

1   letter.

2          Your Honor, he developed prostate cancer from the

3   foliage and Agent Orange that was used by our military during

4   the Vietnam War.  The back injury, Judge, has probably been as

5   serious an injury and an ailment that he's had to contend

6   with.  As he sits there right now, Judge, I know that it is

7   not only discomfort that he's suffering, but he's also in

8   pain.  He can't sit for long periods of time.  He can't stand

9   for long periods of time.  He can't walk for long periods of

10  time.  And last night it culminated with him expressing

11  frustration to me that he appreciated the Court's accepting

12  our application to go forward with sentencing under these

13  unusual circumstances, but he truly wishes to move forward

14  with his life, accepting the fact that what he had done was

15  wrong.

16         Judge, again, between the character that's described

17  in the letters of his children, his devotion to his family,

18  he's an amazing individual who speaks little about his past.

19  I had to drag it out of him, to be quite honest with you.  And

20  I find that to be a normal trait for many of our military

21  servicemen.  They do understate much of what they had gone

22  through, and I believe he's -- he is one of those individuals.

23         That being said, Your Honor, he knows what he has

24  done was wrong.  There is no doubt about it.  He's reflected

25  upon it.  You know, even the fact that after he had lied to

Proceedings - Via Videoconference                    30

1     the agents in February of 2016, even though he called them two

2     months later and initiated a contact, re-contacted with them,

3     told them that he had had enough with the situation and wanted

4     to tell them what had happened, two months had actually

5     continued to pass before he actually made that decision, but

6     he did make it.  And maybe the motivation behind it was, you

7     know, his feeling that he might have been -- well, on monies

8     that had been withheld from him, but the bottom line is,

9     Judge, he did initiate it.

10          And I know he stands before you, Your Honor,

11    remorseful for what he had done and he just wants to go back

12    to doing the things that he had been doing; that is, to take

13    care of his health and to take care of his family.

14          I think under the circumstances, Judge, we are going

15    to recommend a non-custodial sentence and ask the Court to

16    impose that on Mr. Cotogno at this point in time.

17          Thank you.

18          THE COURT:  Yes.  And when you say in your

19    submission that you are seeking a time-served sentence, should

20    I understand that to speak to the question of whether

21    probation is imposed or solely to the question of determining

22    cooperation?

23          MR. LaRUSSO:  Yes, I think I should clarify that,

24    Judge.

25          When I asked for time served, I knew that a term of

Proceedings - Via Videoconference                31

1   supervised release would probably be imposed.  And my

2   recommendation to the Court would be that since he's been on

3   Pretrial Service supervision for almost three years without

4   any problems, I think he's got an exemplary record, Pretrial

5   Services usually notifies the Probation Department.  I don't

6   know if they've done it in this case, that a year's period of

7   supervision, which would be -- supervised release following

8   time served would be appropriate.  That would be my

9   recommendation, Judge.

10          I know the Government, and I really truly appreciate

11  the Government's position, they don't normally take that

12  position, Judge.  They usually recommend a sentence within the

13  guidelines, and in this particular case the fairness of the

14  Government is apparent in their presentation to the Court.

15  But I would ask the Court, maybe considering the unusual

16  circumstances that Mr. Cotogno faces with his medical

17  conditions that you would consider, yes, he's been under

18  supervision, he's had no problems for approximately three

19  years, and that a year's supervision should be sufficient in

20  this particular case.  That would be my recommendation, Your

21  Honor.

22          THE COURT:  Okay.

23          Mr. McDonald.

24          MR. McDONALD:  Thank you, Your Honor.

25          The fraud that occurred here was brazen, and I think

1  Your Honor has gotten a little bit of a taste of the fraud

2  from the submissions and from the pre-sentence report.  And

3  it's only relevant here because it goes to the magnitude of

4  the false statements that Mr. Cotogno gave.  To watch

5  individuals filling shipping containers with cement or road

6  barriers from the defendant's own parking lot to -- is to be

7  clearly committing a crime in front of someone.  And then to

8  be relatively quick -- soon thereafter called upon to provide

9  accurate information upon that crime, which -- which happened

10 here.  I mean it was a matter of weeks after the conspirators

11 closed up shop at the warehouse and the Department of Commerce

12 agents and Homeland Security came to the defendant's warehouse

13 and asked what happened.  And these are -- these are very good

14 agents.  They were moving quickly.  And information that was

15 accurate at the time, undoubtedly, would have helped their

16 investigation.

17        And I think it's fair to say that when they went

18 into the defendant's warehouse, they had every reason to

19 expect that they would receive fully accurate information.

20 And when you look at what Mr. LaRusso has laid out about

21 Mr. Cotogno's past, everything about Mr. Cotogno's past

22 suggests that he should have been a person who would have

23 provided that information; between the military service, the

24 absence of any criminal convictions, the clearly successful

25 business he ran for almost 50 years on Staten Island.  There

1   was absolutely no good reason, no viable justifiable reason,

2   in my view, that he would lie to the face of two federal

3   agents who were asking very reasonable, fair questions, not

4   about him, about things that were happening in his business.

5          And when you consider what he had observed in the

6   warehouse, his ability to then provide the false name one of

7   the cover names that the conspirators were using, his ability

8   to mislead with a fake e-mail address, to provide false

9   contact information, really to throw the agents off of the

10  scent of these conspirators is highly troubling.

11         And so, when we ask for probation here, we're asking

12  because time served and simple a year or two of supervised

13  release, that doesn't necessarily address really the

14  significance of this offense.  No one can foresee when they

15  may be called upon to be a witness to something, to provide

16  accurate testimony.  Mr. Cotogno, despite his health, despite

17  his age, he may, in the course of the next couple of years, be

18  called upon to be a witness to some event in Florida or

19  wherever he is and what I want to make sure, what I think is

20  paramount here, is that Mr. Cotogno keep up front in his mind

21  that he has to be 100 percent truthful at all times when he's

22  called upon to be truthful.  And that didn't happen here and

23  it should have happened.

24         That said, as we've laid out, he has had a career

25  and a background that, quite frankly, was very different than

1  all of the other individuals who have been prosecuted in this

2  case.  He was significantly older than all of the other

3  individuals who were participating in this, most of them were

4  in their twenties and thirties.  I understand that, you know,

5  that kind of age difference between people who you're

6  observing and where you're sitting as a warehouse owner could

7  have a significant effect in one's willingness to confront,

8  you know, younger people who you don't know their background.

9  He did serve very admirably with Vietnam.

10         I have spoken with Mr. Cotogno and Mr. LaRusso, and

11  I won't get into the details of those conversations, but I can

12  say that I think it is fair to say that this was a significant

13  blip on Mr. Cotogno's path, but not one that is characteristic

14  of his overall -- his overall character.

15         And so, when we recommended probation here, I think

16  it was a fair balancing of a significant choice, a significant

17  error that Mr. Cotogno knowingly, fully, willfully made, but

18  balanced against a life and a career on Staten Island that

19  showed a different trend and showed a willingness to be part

20  of the community, to support people in his family, especially

21  his daughter who I know has had a significant number of health

22  issues.  And so, our recommendation of probation, we think, is

23  a fair balancing and it's one that, I think, for two years

24  Mr. Cotogno can have fully in his mind that he needs to

25  continue following the law, that he needs to continue abiding

1   by the terms of the Court, and that will be a close to five

2   years of following, you know, top Court-imposed rules.  I

3   think that that's a fair way to address a very significant

4   series of lies that he chose to give on February 9th of 2016.

5   So, that's the basis of the Government's recommended sentence.

6          We do think a fine is appropriate in view of the

7   defendant's financial resources.  And we, of course, have

8   addressed the restitution question.  We do not believe that

9   any of the victims of the scrap metal fraud are direct victims

10  of this false statement.  They had paid the funds and finances

11  towards the conspiracy prior to Mr. Cotogno giving his

12  statements to the agents.  So, we don't believe any of the

13  losses are directly traceable to those statements.

14  Nevertheless, when Mr. Cotogno identified, through his lawyer,

15  that some of the scrap metal still remained at the warehouse,

16  we endeavored to find a way to forfeit that scrap metal.  That

17  was not successful.

18         Mr. Cotogno then worked through his lawyer -- and

19  this went on, I should say, for a number of weeks -- went on

20  to try to arrange a sale of that scrap metal in order to

21  generate proceeds.  They were eventually able to find a buyer

22  for the scrap metal, and then Mr. Cotogno and his lawyer

23  agreed that that money would be applied to the restitution of

24  the Luthmann crime victims.

25

Proceedings - Via Videoconference          36

1          So, I think it was a circumstance that demonstrated,
2  I think to the Government, that Mr. Cotogno was willing to
3  take steps to right the ship and he had able counsel,
4  Mr. LaRusso, to help him do that, but it was not an easy
5  process to arrange that sale.  I can say from my own
6  experience in e-mails with Mr. LaRusso about it, that went on
7  for a significant period of time.  And I think even though
8  there is only 4,000, approximately, in funds that were raised,
9  it's 4,000 more than the victims of the Luthmann fraud would
10  otherwise be receiving, and so we'd ask the Court impose the
11  agreed amount of restitution to the victims of the Luthmann
12  fraud as well.

13          THE COURT:  Okay.

14          Thank you, Mr. McDonald.

15          Mr. Cotogno, do you want to be heard before I impose
16  sentence?

17          THE DEFENDANT:  I'd like to say I'm truly, truly
18  sorry for this horrendous part of my life.  And I just want to
19  get on with my life when I get healthy and move on.  And I
20  want to thank the Courts for their time.

21          THE COURT:  Okay, thank you, Mr. Cotogno.

22          All right, so, before I impose sentence I do want to
23  just clarify that as to the PSR I adopt the undisputed facts
24  in the PSR.  And to the extent there are outstanding disputes,
25  I find that those potentially disputed facts will not affect

1   sentence.

2           In terms of departures, there are no motions for a

3   departure upwards or downwards from the Guidelines, and so I

4   turn to the Section 3553(a) factors in this case.

5           Now, Mr. Cotogno, you may know already, that statute

6   requires me to impose a sentence that will reflect the

7   seriousness of the crime; promote respect for the law; provide

8   just punishment for the offense; and, among other things,

9   deter criminal conduct by the defendant, yourself, and also

10  potentially deter criminal conduct by others who may seek to

11  engage in this type of crime in the future.

12          And I have also considered the nature and

13  circumstances of the offense and the history and

14  characteristics of Mr. Cotogno in this case.

15          I will talk about what I see as potentially some of

16  the aggravating factors in this case, meaning the factors that

17  militate in furtherance of a more serious sentence, and then

18  turn to what I see as the mitigating factors, which are the

19  factors that argue in favor of a lower sentence.

20          In terms of aggravating factors, this is, as

21  Mr. McDonald discussed, I would say a 1001 conviction that

22  falls at the more serious end of the spectrum of 1001

23  convictions.  These lies were directed to the very core of the

24  investigation here.  This was a fraud, if I understand it

25  correctly, that was destined to be discovered by the victims

1   immediately upon delivery of the goods that made up the basis

2   of the fraud and that fraud could only work, therefore, if the

3   victims were to have difficulty identifying the perpetrators

4   or were to be unable in their entirety to identify the

5   perpetrators.  And the defendant by his actions tended to

6   facilitate the success of the fraud.  I know it wasn't

7   ultimately successful, but tended to facilitate the adjacent

8   fraud here by putting the agents onto a false name and

9   description.  The misstatements in this case, the lie, goes

10  beyond simply saying "I don't know" when asked "Do you know

11  who the perpetrators are," but providing affirmatively false

12  information of that.

13          I do not proceed from the presumption that

14  Mr. Cotogno was a co-conspirator in the fraud, itself.  I

15  don't think it is necessary for me to reach that question and

16  I do not reach that question, but for reasons we have

17  discussed on the record here today, he did, as I mentioned,

18  take some actions that tended to further the fraud, like

19  allowing the use of forklifts in his warehouse, like charging

20  for concrete that was used as filler, et cetera.

21          I also, in determining what I think may be the

22  appropriate in this case, take note of the defendant's

23  relatively significant net worth, even excluding the real

24  estate that he has transferred now to his children.

25          In terms of mitigating factors, I start with

1   Mr. Cotogno's military service.  Serving one's country in a

2   time of war may be the highest form of public service that

3   exists in this country and it is, therefore, very much

4   incumbent on me, I think, to recognize those sacrifices at

5   this time.  The fact that he continues to this day to suffer

6   certain injuries that are a function of his service to the

7   country in Vietnam, so to me that is extremely important to

8   recognize.  And the sentence should reflect all of the history

9   and characteristics of the defendant, but his military

10  service, perhaps, in particular.

11        I do think it is noteworthy that the defendant

12  corrected the false statement on his own initiative.  I

13  understand there are some questions about his motives in

14  making that correction, but in the constellation of 1001

15  convictions we must look more favorably on defendants who go

16  back to the agents and correct the misstatements voluntarily,

17  whatever their motives may be, than we do on defendants whose

18  lies have to be uncovered exclusively through the additional

19  efforts of law enforcement.

20        I note that Mr. Cotogno is, by all accounts, a good

21  father and grandfather, that he's provided exceptional support

22  for his children, especially his daughter in Georgia in light

23  of the some of the health issues that she been dealing with.

24  He's been an upstanding and hard-working member of the

25  community and led an otherwise entirely law-abiding life,

Proceedings - Via Videoconference                40

1   notwithstanding, I guess, the PSR's very brief reference to a

2   youthful joyriding indiscretion in a stolen car.

3          I do note Mr. Cotogno's medical conditions and that,

4   therefore, a term of incarceration might have a greater impact

5   on him than it would on a defendant who was otherwise in

6   perfect health, and that that could be especially true today

7   given the current circumstances we are living through with

8   respect to COVID-19 and the associated pandemic.

9          So, just to sum up, Mr. Cotogno, I see in you

10  somebody who has been throughout his life a hard-working and

11  law-abiding citizen, who is by all accounts a good father and

12  grandfather and upstanding member of the community, somebody

13  who served his country in the military and pursued a

14  productive career.  And the many letters that I received in

15  support of you attest to all those factors.

16         I do not believe, as neither of the parties have

17  requested, that a sentence of incarceration is necessary here

18  to promote the factors under 3553(a).  When considering the

19  defendant's history and characteristics, I do not think a

20  custodial sentence is necessary to afford adequate deterrence

21  to criminal conduct here and to promote respect for the law.

22  The defendant will walk away from this with a federal felony

23  conviction.  He will suffer other collateral consequences of

24  that conviction, and he will be subject to restitution and a

25  fine, which we will discuss in a few moments.

Proceedings - Via Videoconference                41

1          So, I do not impose any term of incarceration.  I do

2    impose restitution in the amount of $3,953.76, pursuant to the

3    stipulation between the parties.

4          Mr. McDonald, I assume that is to be allocated among

5    the victims pro rata based on their losses as set forth in

6    your letter of May 29th?

7          MR. McDONALD:  I believe that's correct, Your Honor.

8    The apportionment, I believe, is by the amount of the loss, so

9    that it's calculated by Probation.

10          THE COURT:  Okay.

11          I am going to impose a fine of $10,000 in this case.

12    I know that that is slightly above the high end of the

13    guidelines range, which is $9,500.  I do that based on, not an

14    upward departure under a guidelines analysis, but rather a

15    variance in the context of the statutory analysis, and I do

16    that based on the following factors:

17          One:  The defendant's relatively significant

18    financial resources here.  Even excluding the real estate, the

19    defendant does have significant means, but a counterweight to

20    that is he does continue to support his children financially.

21          The fine has to reflect, by statute, the gain or

22    loss from the offense, and the offense here resulted, I

23    believe the defendant agrees, in an estimated gain to the

24    defendant of approximately $10,000 in rent payments.  By

25    statute, the fine is also one that needs to take into account

1  the cost of probation.  I do intend to impose, for reasons I

2  will get into in a moment, a one-year term of probation, and

3  the pre-sentence report indicates that the cost, the

4  approximate cost of that one year of supervision is

5  approximately $4,500.

6          So, when you add up the $10,000 in approximate gains

7  to the defendant, the $4500 in approximately costs to the

8  Government of supervision, you get to $14,500.  The $9500 top

9  end of the Guidelines, plus the $3900 in restitution, would

10  come in too far below that 14,500-dollar total and, therefore,

11  I am imposing the fine of $10,000.  We are still a little bit

12  below that 14,500-dollar total, even when you take into

13  account the agreed-upon restitution, but I think it is

14  acceptable to be a little bit below that in light of the fact

15  that the agreed-upon gain to the defendant from the rent in

16  this case was approximately $10,000 instead of exactly

17  $10,000.

18          So, as I note, this is an amount that I come to

19  under the rubric of the variance, and I think it is supported

20  by several factors here which are, one, the size of the losses

21  to the victims; the size of the gain to the defendant; two,

22  the defendant's rather significant financial means; three, the

23  defendant's knowing provision of some support for the fraud,

24  which is undisputed.

25          Turning to probation, the Government has asked, I

Proceedings - Via Videoconference                    43

1    note, for two years of probation, but I conclude that a

2    one-year term of probation is sufficient here.  I do think the

3    risks of recidivism by this specific defendant are relatively

4    low, especially given his recent retirement and sale of his

5    business.  I think a year of probation will send a message

6    that this kind of conduct does not go unpunished, and the one

7    year of probation will also have the added benefit of enabling

8    the Court to make the payment of restitution and fine a

9    condition of probation.

10                Finally, I impose the 100-dollar special assessment

11    that is required by law and, in total, I find that this

12    sentence is sufficient, but not greater than necessary, to

13    comply with the purpose of sentence under Section 3553(a).

14                Mr. LaRusso, any questions from you about the

15    sentence I have just imposed?

16                MR. LaRUSSO:  No, there isn't, Your Honor.  I've

17    talked to my client --

18                THE COURT:  Mr. McDonald -- sorry.

19                MR. LaRUSSO:  My client had some questions, Judge,

20    about the payment.  I told him that it would be worked out

21    with the Probation Department once he meets with them.  That

22    would be the only question, I think, my client probably had in

23    his mind as you were talking.

24                Thank you, Your Honor.

25                THE COURT:  Okay.

Proceedings - Via Videoconference                44

1        Mr. McDonald, any questions from the Government

2   about the sentence I have just imposed?

3        MR. McDONALD:  No, Your Honor, no questions.  Thank

4   you.

5        THE COURT:  Okay.

6        Mr. Cotogno, I notify you now of your right to

7   appeal, as I am required to do.

8        You can appeal your conviction if you believe that

9   your guilty plea was somehow unlawful or involuntary or if

10  there is some other fundamental defect in the proceedings that

11  was not waived by your guilty plea.

12       Under certain circumstances a defendant also has the

13  right to appeal the sentence.  In this case, the plea

14  agreement has waived your right to appeal a sentence of

15  incarceration that is under six months.

16       Any notice of appeal must be filed within 14 days of

17  the filing of the entry of judgment in this case or within 14

18  days of the filing of the Notice of Appeal by the Government.

19  If requested, the clerk will prepare and file a Notice of

20  Appeal on your behalf.  If you cannot afford to pay the cost

21  of an appeal or for appellate counsel, you have the right to

22  apply for leave to appeal what is called *in form of pauperis*,

23  which means you can apply to have the Court waive the filing

24  feel, and on appeal you can also apply for court-appointed

25  counsel.

Proceedings - Via Videoconference                45

1              Are there any other matters to resolve in this case,

2       Mr. LaRusso?

3              MR. LaRUSSO:  No; thank you, Your Honor.

4              MR. McDONALD:  Not for the Government, Your Honor.

5       Thank you.

6              THE COURT:  Mr. McDonald.

7              MR. McDONALD:  No, Your Honor, no additional

8       matters.  Thank you very much.

9              THE DEFENDANT:  Thank you, Your Honor.

10             THE COURT:  Okay.

11             All right, thanks to everybody for their

12      participation today.  Again, under less than ideal

13      circumstances because we are on video, but I understand the

14      defense and the Government's reasons for wanting to move

15      forward expeditiously this way and I think we have done the

16      best we could under the circumstances.

17             Pursuant to 28 U.S. Code Section 753B, I

18      respectfully request that the court reporter produce a

19      transcript of today's proceeding.

20             And with that, we are adjourned.  Thank you

21      everybody and stay safe.

22             MR. LaRUSSO:  You too, Your Honor, and thank you

23      very much.

24             THE DEFENDANT:  Thank you.

25             MR. McDONALD:  Thank you, Your Honor.

Proceedings - Via Videoconference                46

1          MS. NGAI:  Thank you.

2          THE COURT:  Good luck, Mr. Cotogno.

3          (Matter adjourned.)

4          (All parties disconnected.)

5

6

7

8

9

10                    *     *     *     *     *

11

12    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

13

14    /s/ Stacy A. Mace                    June 1, 2020
      _____          _____
15      STACY A. MACE                      DATE

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR